# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS

| | |
|---|---|
| THADDEUS WHITE, Individually and on Behalf of All Others Similarly Situated, | § CONSOLIDATED AMENDED COMPLAINT § FOR VIOLATION OF FEDERAL § SECURITIES LAWS |
| Plaintiff, | § |
| v. | § CIVIL ACTION NO. H-20-590 § § Hon. Lynn N. Hughes |
| JUST ENERGY GROUP INC., PATRICK MCCULLOUGH, and JIM BROWN, | § § JURY TRIAL DEMANDED |
| Defendants. | § § § § |

Lead Plaintiff Gregory Gutman ("Plaintiff") individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants (defined below), alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief as to all other matters based on the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of Securities and Exchange Commission ("SEC") filings by Just Energy Group Inc. ("Just Energy" or the "Company"), as well as media and analyst reports about the Company. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a class action on behalf of persons or entities, other than Defendants, who purchased or otherwise acquired publicly traded Just Energy securities from November 9, 2017 through August 19, 2019, inclusive (the "Class Period"). Plaintiff seeks to recover compensable

damages caused by Defendants' violations of the federal securities laws under the Securities Exchange Act of 1934 (the "Exchange Act").

2.      Just Energy is an energy utility company that operates in a variety of markets including the United Kingdom and Texas.  As a utility operator it bills customers after providing electricity services and therefore always carries an accounts receivable balance reflecting outstanding customer bills.  There is an inherent risk that some customers will not pay their bills and the receivable will be written off in whole or in part.

3.      When Just Energy provided its service and invoiced customers, it would book revenue and an associated accounts receivable.  It would also create an allowance for doubtful accounts as a portion of accounts receivable. If the allowance for doubtful accounts increases in a period the company will also book a corresponding bad debt expense.

4.      In April of 2018, Patrick McCollough took over as CEO with a mandate to increase sales to new customers.  This effort led to a breakdown in the company's operational controls over the typical credit profiles of Just Energy's customers, particularly in the state of Texas.  As a result, the risk of bad debt to Just Energy accumulated.  Nevertheless, Just Energy failed to take this into account when reporting its allowances for bad debts.  Despite this breakdown in internal controls, Just Energy continued to reassure investors that its internal controls were effective.  Ultimately, Just Energy came clean to investors through a series of disclosures from July to November of 2019, restating their 2019 financial statements and admitting to undisclosed material weaknesses in their internal controls, acknowledging that their allowance for doubtful accounts was more than double what they originally disclosed, and its bad debt expense was increased 240%. CEO McCollough abruptly resigned in August of 2019 as Just Energy's fraud came to light.

### JURISDICTION AND VENUE

5.      The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange

Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

6.     This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.

7.     Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b) as the Company has offices and conducts business in this District and a substantial part of the conduct complained of herein occurred in this District.

8.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## PARTIES

9.     Plaintiff, as set forth in the previously filed certification incorporated by reference herein, purchased Just Energy securities during the Class Period and was economically damaged thereby.

10.     Defendant Just Energy is incorporated under the laws of Canada with its principal executive offices located in Ontario, Canada. Just Energy has offices, operates, and provides services in Texas. The Company's registered agent is located in Houston, Texas. Just Energy purports to be a consumer company focused on essential needs, including electricity and natural gas commodities; on health and well-being, through products such as water quality and filtration devices; and on utility conservation, including renewable energy options. Just Energy's securities trade on the New York Stock Exchange ("NYSE") under the symbol "JE."

11.     Defendant Deborah Merril ("Merril") was the Co-Chief Executive Officer of Just Energy from April 2014 to April 2018. Before that time, she was President of Hudson Energy, and

previously served as the Executive Vice President, Commercial Division at Just Energy, Senior Vice President, Marketing, at Just Energy.  Merril was a co-founder of Just Energy. She was previously an executive at Enron Energy Services, working on deal structuring.

12.     Defendant James Lewis ("Lewis") was the Co-Chief Executive Officer of Just Energy from April 2014 to April 2018. Prior to that he was the Chief Operating officer of Just Energy.  Earlier, he was Senior Vice President for Just Energy's North American Operations. He was previously an executive at Enron.

13.     Defendant Patrick McCullough ("McCullough") was the Chief Executive Officer of Just Energy from April 2018 until August 2019. He was the Chief Financial Officer ("CFO") of Just Energy from August 2014 to April 2018. Before that, he was Chief Financial Officer, and then Chief Executive Officer at Amonix, Inc.

14.     Defendant Jim Brown ("Brown") has been the CFO of Just Energy since April 2018. He was President of Hudson Energy, COO of Hudson Energy, and Senior Vice President at Just Energy.

15.     Defendants Merril, Lewis, McCullough, and Brown are herein referred to as "Individual Defendants."

16.     Collectively, Defendant Just Energy and Individual Defendants are herein referred to as "Defendants."

17.     Each of the Individual Defendants:

18.     directly participated in the management of the Company;

19.     was directly involved in the day-to-day operations of the Company at the highest levels;

20.     was privy to confidential proprietary information concerning the Company and its

4

business and operations;

21.     was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

22.     was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

23.     was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

24.     approved or ratified these statements in violation of the federal securities laws.

25.     Just Energy is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency as all of the wrongful acts complained of herein were carried out within the scope of their employment with authorization.

26.     The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to Just Energy under *respondeat superior* and agency principles.

## SUBSTANTIVE ALLEGATIONS

### Background

27.     Just Energy is an electricity utility that primarily sells natural gas powered electricity to customers.  Through various subsidiaries, Just Energy carries on business in United States in the states of Illinois, New York, Indiana, Michigan, Ohio, New Jersey, California, Maryland, Pennsylvania, Massachusetts, Georgia, Texas and Delaware and in Canada in the provinces of Ontario, Alberta, Manitoba, Québec, British Columbia and Saskatchewan. Just Energy sells electricity and natural gas in the United Kingdom to commercial customers under the Hudson brand and to residential consumers under the Green Star Energy brand. In December 2016,

Just Energy entered the German retail energy market. In 2017, Just Energy entered the Japanese and Irish retail energy markets.

**Just Energy Takes on High Credit Risk Customers, But Fails to Factor this in to their Accounts Receivable Aging**

28.     Just Energy is a utility company that bills residential customers for electricity on a monthly basis. Just Energy therefore at any given time carries an accounts receivable balance that in large part consists of money owed to it by customers. As Just Energy explains in its form 40F for the year 2018, to take into account the fact that some customer account balances will actually be uncollectable, Just Energy records an allowance for uncollectable accounts that reflects an estimate of losses on account receivable balances. Just Energy claimed that it determines the allowance for doubtful accounts on customer receivables by applying loss rates based on historical results to the outstanding receivable balance.

29.     In April of 2018 McCollough was promoted to the position of CEO. As Executive Chair Rebecca Macdonald explained at the June 27, 2018 shareholder meeting, McCollough was brought on to increase sales. McCollough confirmed at the same meeting that if they did not achieve increased sales in his first year, he would consider it a failure.

30.     Just Energy claimed that, as they ramped up sales, they were closely monitoring the risk of taking on bad debt as they aggressively expanded their customer base, particularly in Texas.  According to Brown, during a conference call dated February 7, 2019, Just Energy was extremely focused on bad debts, particularly in Texas. McCollough, on that same call, noted that Just Energy was exposed to credit risk in Texas, but claimed that they were taking steps to protect themselves from riskier customers. "So in markets like Texas, just to give you an example, we have a requirement to sell to any customer depending on -- independent of what their credit rating is. However, we have the opportunity for lower credit scores to hold them accountable for a prepaid

product or a deposit to protect ourselves. And we've actually raised the credit threshold where we

do that. So we are attempting to call some of the higher credit risk customers."

31.     On May 16, 2019, Defendants again reassured investors that the risk of bad debt

was under control. Responding to a question regarding a quarterly decline in the bad debt expense,

Brown stated "we've taken a lot of efforts around customer analytics. We brought in a team of

folks in BI to focus on the drivers of bad debt. I think we're starting to see some of the benefits of

that. We've also taken actions to align credit scores in the proper channels to be of optimal value.

So I think we'll continue to monitor as we go. But I think we could continue to see the bad debt

improve."

32.     However, rather than closely track credit risk among new customers as promised,

Just Energy's growth strategy instead led to a breakdown in operational controls to screen out high

risk clients.   As Scott Gahn, the now-CEO of Just Energy explained in a conference call on

November 7, 2019, by mid 2018 Just Energy's internal controls to screen out high risk customers

broke down, and Just Energy began enrolling a significant number of riskier than intended

customers, and then failed to reflect that fact in its financial statements reporting on bad debt and

doubtful accounts.

**Materially False and Misleading Statements**
**Issued During the Class Period**

33.     On November 9, 2017, the Company reported its quarterly results for the period

ended September 30, 2017 in a Form 6-K (the "November 2017 6-K") filed with the SEC.

Attached to the November 2017 6-K was the Management's discussion and analysis as of

November 8, 2017, which stated the following with regard to internal controls.

> As of September 30, 2017, the Co-Chief Executive Officers ("Co-CEOs") and
> Chief Financial Officer ("CFO") of the Company, along with the assistance of
> senior management, have designed disclosure controls and procedures to

provide reasonable assurance that material information relating to Just Energy is made known to the Co-CEOs and CFO, and have designed internal controls over financial reporting based on the criteria established in the 2013 Internal Control – Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (the COSO criteria) to provide reasonable assurance regarding the reliability of financial reporting and the preparation of consolidated financial statements in accordance with IFRS.

During the three and six months ended September 30, 2017, there were no changes in Just Energy's internal controls over financial reporting that occurred that have significantly affected, or are reasonably likely to significantly affect, the Company's internal controls over financial reporting.

34.    On June 1, 2018, the Company filed its annual report on Form 40-F with the SEC for the period ended March 31, 2018 (the "2018 40-F"). The 2018 40-F contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants McCullough and Brown. The 2018 40-F also contained "Management's responsibility for financial report" which was signed by Defendants McCullough and Brown, affirming the previously reported financial results and stating that the Company's internal control over financial reporting was effective and stating:

Management has evaluated the design and operation of the Company's internal control over financial reporting as of March 31, 2018, and has concluded that such internal control over financial reporting is effective.

35.    The company also reported its allowance for doubtful accounts as follows:

|  | March 31, 2018 | March 31, 2017 |
|---|---|---|
| Balance, beginning of year | $    49,431 | $    58,789 |
| Provision for doubtful accounts | 56,300 | 56,041 |
| Bad debts written off | (41,802) | (64,262) |
| Foreign exchange | (3,808) | (1,137) |
| Balance, end of year | $    60,121 | $    49,431 |

36.    On August 14, 2018, the Company reported its quarterly results for the period ended June 30, 2018 in a Form 6-K ("August 2018 6-K") filed with the SEC. The August 2018 6-K stated

Just Energy's reported sales of CAD $876.46 million, net loss of CAD $41.42 million, and trade and other receivables of CAD $677.23 million. Attached to the August 2018 6-K was the Management's discussion and analysis as of August 8, 2018, which stated the following with regard to internal controls.

> The CEO and CFO of the Company have designed or caused to be designed under their direct supervision the Company's Internal Control over Financial Reporting ("ICFR") which has been effected by Just Energy's Board of Directors, management and other personnel in order to provide reasonable assurance regarding the reliability of financial reporting and the preparation of the interim condensed consolidated financial statement in accordance with IFRS.
>
> During the three months ended June 30, 2018, there were no changes in the Company's ICFR that have materially affected, or are reasonably likely to materially affect, the Company's ICFR.

37.    Just Energy also reported its balance for doubtful accounts as follows:

|  | June 30, 2018 | March 31, 2018 |
|---|---|---|
| **Balance, beginning of period** | $ **60,121** | $ 49,431 |
| Provision for doubtful accounts | **20,800** | 56,300 |
| Bad debts written off | **(37,867)** | (41,802) |
| Adjustment from IFRS 9 adoption | **23,636** | - |
| Other | **(1,469)** | (3,808) |
| **Balance, end of period** | $ **65,221** | $ 60,121 |

38.    On November 8, 2018, the Company reported its quarterly results for the period ended September 30, 2018 in a Form 6-K (the "November 2018 6-K") filed with the SEC. Therein, the Company reported sales of CAD $956.84 million, net loss of CAD $21.45 million, and trade and other receivables of CAD $694.48 million. Attached to the November 2018 6-K was the Management's discussion and analysis as of November 7, 2018, which stated the following with regard to internal controls:

> Both the CEO and CFO have designed, or caused to be designed under their supervision, the Company's Internal Control over Financial Reporting ("ICFR")

which has been effected by the Board of Directors, management and other personnel to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements in accordance with IFRS. During the six months ended September 30, 2018, there were no changes that materially affected, or are reasonably likely to materially affect, the Company's ICFR.

39.    Just Energy also reported its allowance for doubtful accounts.

| | Sept. 30, 2018 | March 31, 2018 |
|---|---|---|
| **Balance, beginning of period** | $    60,121 | $    49,431 |
| Provision for doubtful accounts | 45,184 | 56,300 |
| Bad debts written off | (38,902) | (41,802) |
| Adjustment from IFRS 9 adoption | 23,636 | - |
| Foreign exchange | (3,744) | (3,808) |
| **Balance, end of period** | $    86,295 | $    60,121 |

40.    On February 7, 2019, the Company reported its quarterly results for the period ended December 31, 2018 in a Form 6-K (the "February 2019 6-K") filed with the SEC. Therein, the Company reported sales of CAD $966.65 million, net income of CAD $27.03 million, and trade and other receivables of CAD $786.85 million. Attached to the February 2019 6-K was the Management's discussion and analysis as of February 6, 2019, which stated the following with regard to internal controls:

Both the CEO and CFO have designed, or caused to be designed under their supervision, the Company's Internal Control over Financial Reporting ("ICFR") which has been effected by the Board of Directors, management, and other personnel, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements in accordance with IFRS. During the nine months ended December 31, 2018, there were no changes that materially affected, or are reasonably likely to materially affect, the Company's ICFR.

41.    Just Energy also reported its allowance for doubtful accounts

| | **Dec. 31, 2018** | March 31, 2018 |
|---|---|---|

| | | | |
|---|---:|---|---:|
| **Balance, beginning of period** | **$ 60,121** | $ | 49,431 |
| Provision for doubtful accounts | **65,389** | | 56,300 |
| Bad debts written off | **(40,958)** | | (41,802) |
| Adjustment from IFRS 9 adoption | **23,636** | | - |
| Foreign exchange | **421** | | (3,808) |
| **Balance, end of period** | **$ 108,609** | $ | 60,121 |

42.     On May 16, 2019 Just Energy conducted an earnings call where Defendant Brown

stated that

> I think we've -- as we've mentioned in prior quarters, we've taken a lot of efforts around customer analytics. **We brought in a team of folks in BI to focus on the drivers of bad debt. I think we're starting to see some of the benefits of that. We've also taken actions to align credit scores in the proper channels to be of optimal value. So I think we'll continue to monitor as we go. But I think we could continue to see the bad debt improve**.

43.     On that same call, Defendant McCollough stated

> We're working with a company called WNS on credit and collections in both North America and the U.K., and we're seeing significant collections improvements. In fact, they've been helping us recover bad debt that have previously been fully reserved. So we do see opportunity in bad debt as we go forward. And we're assuming minimal improvement in the guidance that we gave you.

44.     On May 22, 2019, the Company filed its annual report on Form 40-F with the SEC

for the period ended March 31, 2019 (the "2019 40-F"). The 2019 40-F contained signed SOX

certifications by Defendants McCullough and Brown. The 2019 40-F reported sales of CAD $3.8

billion, net loss of CAD $122.87 million, and trade and other receivables of CAD $783.78 million.

The 2019 40-F also stated that the Company had identified and remediated deficiencies in its

internal control over financial reporting, stating in relevant part:

> During January 2019, in connection with the Company's assessment of internal controls over financial reporting, the Company which identified and subsequently remediated a deficiency in the design and operating effectiveness of certain internal controls related to certain account balances in certain markets. Specifically, the Company identified a deficiency in the design of internal controls through the effective operation of alternative internal controls related to the preparation, analysis and review of certain gross margin accounts in those markets. Upon identification of the deficiency, the Company designed

internal controls were designed, [sic] including account reconciliations, to remediate the deficiency in design. These new internal controls were effectively operated for February 28, 2019 and March 31, 2019. Just Energy considers the internal control deficiency to be effectively remediated as at March 31, 2019.

As a result of remediating this deficiency in the design of internal controls and operating them in an effective manner, the Company identified certain individually insignificant reconciling items that should have been recorded in periods prior to April 1, 2017. The Company determined that it was appropriate to revise its consolidated financial statements as at April 1, 2017, as denoted within Note 5 of the consolidated financial statements, to correct for an aggregate error of $14.2 million in the opening accumulated deficit account. It was determined that this deficiency in the design and operating effectiveness of these particular internal controls resulted in no significant error in the income statements for the years ended March 31, 2019 and 2018.

45.    Just Energy also reported an allowance for doubtful accounts

|  | March 31, 2019 | | March 31, 2018 |
|---|---|---|---|
| **Balance, beginning of year** | $ | **60,121** | $ 49,431 |
| Provision for doubtful accounts | | **81,037** | 56,300 |
| Bad debts written off | | **(90,231)** | (41,802) |
| Adjustment from IFRS 9 adoption | | **23,636** | - |
| Foreign exchange | | **(3,363)** | (3,808) |
| **Balance, end of year** | $ | **71,200** | $ 60,121 |

46.    The above statements identified in ¶¶ 33-45  were materially false and/or misleading, and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants failed to disclose to investors that beginning in Mid 2018, Just Energy began to experience a break down in internal controls related to customer enrollment and debt collection, which led to an increase in the risk of nonpayment of debt. Just Energy falsely assured investors that it had remediated the deficiency in the design of its internal controls and was operating them in an effective manner.  The foregoing statements were further misleading because Just Energy did not adequately reserve for bad debts associated with  its trade receivables to reflect these issues, thereby rendering previously issued financial results it publicly disseminated materially false and misleading. Just Energy also failed to timely disclose these issues as material weaknesses in their internal controls.

**The Truth Begins to Emerge**

47.    On June 6, 2019, Just Energy announced the commencement of a Strategic Review

of the company by independent directors.

> TORONTO, June 06, 2019 (GLOBE NEWSWIRE) -- Just Energy Group Inc.
> ("Just Energy" or the "Company") today announced that its Board of Directors
> has decided to undertake a formal review process to evaluate strategic
> alternatives available to the Company (the "Strategic Review"). This decision
> follows expressions of interest from a number of parties concerning potential
> transactions involving the Company.
>
> The Board of Directors has appointed its Strategic Initiatives Committee,
> comprised of all of the independent directors, to oversee the Strategic Review,
> with the assistance of Guggenheim Partners, LLC and National Bank Financial
> Inc., who have been retained as co-financial advisors.  Rebecca MacDonald,
> Executive Chair of the Company said, "The Board's goal is to unlock
> shareholder value with a view to the best interests of Just Energy and all its
> stakeholders."
>
> This Strategic Review is not expected to have an impact on customers, suppliers
> or employees of Just Energy, nor on its operations, which are continuing as
> usual.
>
> The Company has not established a definitive timeline to complete the Strategic
> Review, no decisions related to any strategic alternative have been reached at
> this time and there is no assurance that a transaction will result from the Strategic
> Review. The Company does not intend to comment further with respect to the
> Strategic Review unless and until it determines that additional disclosure is
> appropriate in the circumstances and in accordance with the requirements of
> applicable securities laws.

48.    On July 23, 2019, before the market opened, Just Energy disclosed that it had

"identified customer enrolment and non-payment issues, primarily in Texas, over the past 12

months" and that, as a result, it expected an impairment charge of CAD $45 to $50 million to its

Texas residential accounts receivable. The press release stated, in relevant part:

> Just Energy Group Inc. ("Just Energy") announced today that as part of the
> previously announced Strategic Review process, management identified
> customer enrolment and non-payment issues, primarily in Texas, over the past

12 months. As management identified these issues, more robust operational controls were put in place, culminating in numerous improvements being implemented during June and July 2019.

Due to the identified issues, management is updating its provisioning methodology used to estimate its reserve for trade receivables. Management expects an incremental impairment of the Texas residential accounts receivable of approximately CAD $45 to $50 million as of June 30, 2019.

"The enrolment and non-payment issues have been remediated and management is confident in the business and operational controls currently in place. These issues will not have a continuing effect on future cash flows," said Rebecca MacDonald, Just Energy's Executive Chair.

49.     On this news, the Company's share price fell $0.66 per share, or over 15%, to close at $3.72 per share on July 23, 2019, on unusually heavy trading volume.

50.     On August 5, 2019, the Company announced Defendant McCullough's departure as President, CEO, and director of Just Energy effective immediately.

51.     On this news, Just Energy's share price fell $0.38 per share, or more than 10.7%, over the next two trading days to close at $3.16 per share on August 6, 2019, on unusually heavy trading volume.

52.     On August 14, 2019, after the market closed, Just Energy issued a press release entitled "Just Energy Reports Fiscal First Quarter 2020 Results." The press release stated that the Company was suspending its dividend, that its adjustment to account receivables would be larger than expected, and that Just Energy would be restating several previously issued financial statements. Further, the press release stated in relevant part:

During the quarter, management identified operational issues in customer enrolment and non-payment of accounts receivable in the Texas residential market, resulting in an aggregate adjustment of $58.6 million. Management also proceeded to identify collection issues in the U.K. market, resulting in an aggregate adjustment of $74.1 million. As a result, the Company recorded additional allowances for doubtful accounts which are included in the Company's restated third quarter and year-end financial statements for fiscal year 2019, and in the Company's first quarter results for fiscal year 2020, as

referenced within each respective management discussion and analysis.

53.     On this news, Just Energy's share price plummeted $1.39 per share, or over 44.8%, over the next two trading days to close at $1.71 per share on August 16, 2019, on unusually heavy trading volume.

54.     On August 15, on a call with investors, Scott Gahn, the new CEO of Just Energy, stated that:

> The second thing I'd like to talk about is the improvements in operational controls, recognition of impairments and the continued focus on financial discipline. Given my level of experience at Just Energy, I've been able to quickly involve myself in the operational issues underlying the Texas AR impairment that was announced last month, leading me to expand our review and drive the resolution of similar issues in our U.K. business, quantifying on additional impairment taken in that business. Both of these impairments have been recognized in their entirety, and strict remedial actions and policies were swiftly put in place to prevent such operational breakdowns from occurring again, restoring the operational and financial discipline and integrity that Just Energy, the Just Energy I know, is known for.

> Perhaps the most important thing I can say today regarding this matter is that these enrollment and nonpayment issues have been remediated. We have soberly assessed our opportunities for collection. We have made the difficult decisions, and we have booked the impairments. This means that they will not have a continued effect on future cash flows, and I, along with the entire management team and board, are confident in the business and operational controls in place going forward.

55.     On August 19, 2019, Just Energy filed a Form 40-F/A with the SEC (the "2019 40-F/A") that restated its financial results for fiscal year ending March 31, 2019. The  2019 40-F/A disclosed that Just Energy's allowance for doubtful accounts for its fiscal year ended March 31, 2019 was understated by $111.2 million consisting of $53.7 million for doubtful accounts in its Texas residential market and $57.5 million related to operational and collection issues in its United Kingdom (U.K.) market. The 2019 40-F/A continued in relevant part:

It was identified that during the quarters ended December 31, 2018, March 31, 2019 and June 30, 2019, management failed to effectively operate the control designed to capture appropriate expected credit loss rates to be reflected in the estimated allowance for doubtful accounts in the Texas residential market and the U.K. market. This material weakness arose due to insufficient analysis of a rapid deterioration of the aging of the Company's accounts receivable caused by operational enrollment deficiencies in the Texas market, and due to operational and accounts receivable non-collection issues in the U.K. market. The CEO and the CFO concluded that as a result of the material weakness in internal control over financial reporting, the Registrant's design and operation of the Registrant's disclosure controls and procedures were not effective at March 31, 2019 to ensure that the information required to be disclosed in the reports that the Registrant files with or submits to the Commission is recorded, processed, summarized and reported, within the required time periods

56.     The 40-F/A included the following note regarding the restatement:

Management identified operational issues in customer enrolment and non-payment in the Texas residential market. Management revisited the allowance for doubtful accounts as at March 31, 2019 and determined that additional reserves of $53.7 million were required at March 31, 2019. Management also identified collection issues in the United Kingdom ("U.K.") market and determined that additional reserves of $57.5 million were required at March 31, 2019. Management determined that the understatement was material, and as a result the financial statements for the year ended March 31, 2019 should be restated. Accordingly, in compliance with IAS 10, Events after the balance sheet date, the authorization date of these financial statements has been updated to August 14, 2019, and the financial statements reflect all subsequent events up to this date.

The following tables summarize the effects of the adjustment described above.

Line items on the restated consolidated statement of financial position and restated consolidated statement of changes in shareholders' equity

| | As at March 31, 2019 (As revised Note 5(b)) | Adjustment | As at March 31, 2019 (Restated) |
|---|---|---|---|
| Trade and other receivables | $      783,780 | $     (111,165) | $      672,615 |
| Current assets | $   1,133,423 | $     (111,165) | 1,022,258 |
| Deferred income tax assets | 9,492 | (8,400) | 1,092 |
| Long term liabilities | 603,674 | (8,400) | 595,274 |
| Total Assets | $   1,746,068 | $     (119,565) | 1,626,503 |
| | | | |
| Accumulated deficit | $   (1,271,136) | $     (119,565) | (1,390,701) |

| | | | | |
|---|---|---|---|---|
| Total shareholders' equity deficit | $ | 30,550 $ | (119,565) $ | (89,015) |
| Total liabilities and shareholders' equity deficit | $ | 1,746,068 $ | (119,565) $ | 1,626,503 |

Line items on the restated consolidated statements of income (loss)

| | | As at March 31, 2019 (As revised Note 5(b)) | Adjustment | As at March 31, 2019 (Restated) |
|---|---|---|---|---|
| Other operating expenses | $ | 115,016 $ | 111,165 $ | 226,181 |
| Total expenses | $ | 569,944 $ | 111,165 $ | 681,109 |
| Operating profit before: finance costs, change in fair value of derivative instruments and other income, net | $ | 142,271 $ | (111,165) $ | 31,106 |
| Profit (loss) before income taxes | $ | (97,662) $ | (111,165) $ | (208,827) |
| Provision for (recovery of) income taxes | | 2,829 | 8,400 | 11,229 |
| Profit (loss) from continuing operations | $ | (100,491) $ | (119,565) $ | (220,056) |
| Profit (loss) for the year | $ | (122,870) $ | (119,565) $ | (242,435) |
| Profit (loss) for the year attributable to: | | | | |
| Shareholders of Just Energy | $ | (122, 678) $ | (119,565) $ | (242,243) |
| Non-controlling interest | | (192) | - | (192) |
| Earnings (loss) per share from continuing operations | | | | |
| Basic | $ | (0.73) $ | (0.80) $ | (1.54) |
| Diluted | $ | (0.73) $ | (0.80) $ | (1.54) |
| Earnings (loss) per share available to shareholders | | | | |
| Basic | $ | (0.88) $ | (0.80) $ | (1.68) |
| Diluted | $ | (0.88) $ | (0.80) $ | (1.68) |

Line items on restated consolidated statements of comprehensive income (loss)

| | | As at March 31, 2019 (As revised Note 5(b)) | Adjustment | As at March 31, 2019 (Restated) |
|---|---|---|---|---|
| Profit (loss) for the year | $ | (122,870) $ | (119,565) $ | (242,435) |
| Total comprehensive income (loss) for the year, net of tax | $ | (117,848) $ | (119,565) $ | (237,413) |
| Total comprehensive income (loss) attributable to: | | | | |
| Shareholders of Just Energy | $ | (117,656) $ | (119,565) $ | (237,221) |

Line items on restated consolidated statement of cash flows

| | | As at March 31, 2019 (As revised Note 5(b)) | Adjustment | As at March 31, 2019 (Restated) |
|---|---|---|---|---|
| Profit (loss) from continuing operations before income taxes | $ | (97,662) $ | (111,165) $ | (208,827) |
| Profit (loss) before income taxes | $ | (120,037) $ | (111,165) $ | (231,202) |
| Net change in working capital balances | $ | (124,138) $ | 111,165 $ | (12,973) |

57.   As the above chart shows, the adjustments to allowance for bad debt, bad debt expense, accounts receivable and profit are extremely large, material adjustments.

58.   Just Energy also stated in that same 40-F/A that they began remediating this

material weakness through operational and financial reporting control changes throughout the organization during the quarter ending June 30, 2019.

59.     On this news, share price fell $0.15 per share, or over 8.77%, to close at $1.56 per share on August 19, 2019, further damaging investors.

60.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

**The Restatement was an Admission of Material GAAP Violations**

61.     Restatements are required for "material" accounting errors that existed at the time financial statements were prepared. *See* SFAS 154. (ASC 250-10). By issuing the Restatement, Just Energy acknowledged that its financial statements for the restated periods were materially inaccurate, and did not comply with GAAP and were therefore false and misleading *when issued*. 17 C.F.R. § 210.4-01(a)(1).

62.     GAAP also makes a distinction between a change in an estimate and the correction of historic facts. If an estimate is changed, then no restatement is necessary. However, if facts in existence at the time were not properly recorded or considered, then the original statement must be corrected. Corrections are to be adjusted by recording adjustments to current and previously issued financial statements. ASC 250-05-04, 250-10-20. Thus, by restating, Just Energy admitted that these were not judgmental mistakes in estimation, but that it had ignored or misused known facts that existed at the time the financial statements were prepared, evidencing knowing or reckless misconduct.

**The Restatement was also an Admission of Material Violations of Internal Controls**

63.     In making its assessment of internal control over financial reporting, Just Energy's

management used the criteria established by the Committee of Sponsoring Organizations of the

Treadway Commission Report, *Internal Control – Integrated Framework* (1992) ("COSO

Report").[1]

64.     The COSO Report, borrowing from generally accepted auditing standards, defines

fair presentation in financial statements as containing the following:

- the accounting principles selected and applied have general acceptance;

- the accounting principles are appropriate in the circumstances;

- the financial statements are informative of matters that may affect their use, understanding and interpretation; and

- the financial statements reflect the underlying transactions and events in a manner that presents the financial position, results of operations and cash flows stated within a range of acceptable limits, that is, limits that are reasonable and practical to attain in financial statements.[2]

65.     COSO makes clear that Management is responsible for complying with GAAP

66.     In the Restatement, Just Energy also admitted that it failed to live up to the COSO

standards and that its prior statements (as reflected in the SOX certifications) regarding the

effectiveness of its internal controls were in fact false when made:

> **Restatement of previously issued Consolidated Financial Statements for the correction of an understatement of the allowance for doubtful accounts**
>
> Subsequent to the issuance of the financial statements for the year ended March 31, 2019, management determined that the allowance for doubtful accounts was

---

[1] 2019 Form 40-F/A June 6, 2019. The COSO report was originally issued in September 1992 as a four volume set. An *Addendum to Reporting to External Parties* was issued in May 1994. On May 14, 2013 COSO released an updated version of the entire framework. Unless otherwise noted, all references to the COSO report refer to the 1992 issuance.
[2] COSO Report, Risk Assessment, pg. 35.

understated by $111.2 million.

Management identified operational issues in customer enrolment and non-payment in the Texas residential market ("the Texas residential enrolment and collections impairment"). Management has revisited the allowance for doubtful accounts and determined that additional reserves of $53.7 million were required at March 31, 2019. Management also identified operational and collection issues in the United Kingdom ("U.K.") market ("the U.K. receivables impairment") and determined that additional reserves of $57.5 million were required at March 31, 2019. Refer to Note 5 of the Restated Consolidated Financial Statements at March 31, 2019 for the effects of the adjustment described above.

Consequently, the Company's management has concluded that a material weakness in its internal controls over financial reporting existed during the year ended March 31, 2019.

A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the Company's annual or interim financial statements will not be prevented or detected on a timely basis.

The material weakness was caused by a failure to effectively operate a control to capture appropriate expected credit losses to be reflected in the estimated allowance for doubtful accounts. This issue occurred in the Texas residential market as a result of a rapid deterioration of the Company's accounts receivable aging caused by operational enrolment deficiencies, and in the U.K. market as a result of operational and customer non-payment issues, as further described in "Internal Control over Financial Reporting".

67.     In other words, Just Energy, despite earlier stating that their internal controls were effective, belatedly admitted that they were not effective, because it understated the allowance for doubtful accounts by $111.2 million, due primarily to the fact that the Company failed to take into account the impact that its' enrollment of high risk customers in the US, and its failure to collect on debt in the UK would have on bad debt.

68.     The Amended 40-F went on to state that:

**INTERNAL CONTROL OVER FINANCIAL REPORTING**

Both the CEO and CFO have designed, or caused to be designed under their supervision, the Company's Internal Control over Financial Reporting ("ICFR") which has been affected by the Board of Directors, management, and other personnel, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements in accordance with IFRS. Based on that evaluation the CEO and CFO concluded that because of the material weakness described below, the Company's disclosure controls and procedures were not effective.

*Identification of material weakness*

During the quarters ended December 31, 2018, March 31, 2019, and June 30, 2019, Management failed to effectively operate the control designed to capture appropriate expected credit loss rates to be reflected in the estimated allowance for doubtful accounts in the Texas residential market and the U.K. market. This material weakness arose due to insufficient analysis of a rapid deterioration of the aging of the Company's accounts receivable caused by operational enrolment deficiencies in the Texas market, and due to operational and accounts receivable non-collection issues in the U.K. market.

On July 23, 2019, the Company announced operational measures implemented in the Texas residential market to address identified customer enrolment issues arising during prior periods that lead to additional overdue accounts being identified during the quarter ended June 30, 2019 that were impaired. Management identified these issues through operating controls related to the expected credit loss calculation.

Management identified an impairment of certain accounts receivable within the Texas residential markets of $58.6 million at June 30, 2019, of which $34.5 million relates to the quarter ended December 31, 2018, $19.2 million relates to the quarter ended March 31, 2019, and $4.9 million relates to the quarter ended June 30, 2019.

During the operation of the same control that identified the Texas enrolment and collections impairment at June 30, 2019, the Company determined the allowance for doubtful accounts related to the U.K. receivables required an adjustment of

$74.1 million at June 30, 2019 of which $40.1 million relates to the quarter ended December 31, 2018, $17.4 million relates to the quarter ended March 31, 2019 and $16.6 million relates to the quarter ended June 30, 2019.

A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the company's annual or interim financial statements will not be prevented or detected on a timely basis. Due to the aforementioned adjustments, management identified a material weakness after issuing the financial statements for the year ended March 31, 2019.

*Remediation of material weakness in internal control over financial reporting*

Management is committed to the planning and implementation of remediation efforts to address the material weakness, as well as to foster continuous improvement in the Company's internal controls. These remediation efforts are underway and are intended to address the identified material weakness and enhance the overall financial control environment

During the quarter ended June 30, 2019, the Company made operational and financial reporting control changes throughout the organization and engaged third parties to advise the Company regarding this material weakness.

Management enhanced its methodology that quantifies and contemplates the aging profile of receivables, and recent collection history, in a more disaggregated manner than the model utilized at December 31, 2018 and at March 31, 2019, as described within Note 5 of the Company's restated consolidated financial statements for the year-ended March 31, 2019.

To further remediate the material weakness identified herein, the management team, including the CEO and CFO, have reaffirmed and reemphasized the importance of internal control, control consciousness and a strong control environment. The remediation of the material weakness is ongoing as not enough time has elapsed in order to conclude that it is operating effectively.

No assurance can be provided at this time that the actions and remediation efforts the Company has taken or will implement will effectively remediate the material weaknesses described above or prevent the incidence of other significant deficiencies or material weaknesses in the Company's internal controls over

financial reporting in the future. The design of any system of controls is based
in part upon certain assumptions about the likelihood of future events, and there
can be no assurance that any design will succeed in achieving our stated goals
under all potential future conditions.

69.     As the foregoing passage makes clear, although the company developed enhanced

methodologies for analyzing bad debt, it nonetheless was able to detect the material weakness in

internal controls over financial reporting by using its old methodology.  Therefore, reason the

material weakness was not disclosed earlier was not because the Company's methodology could

not detect the weakness, but because the company did not implement that methodology in a timely

fashion.

**The Restatement was an Admission of Filing False Sarbanes Oxley Certifications**

70.     The Sarbanes Oxley Act was passed in response to a series of dramatic corporate

frauds, most notably the implosion of the Enron Corporation.  Among other protections, the

Sarbanes Oxley Act requires the CEO and CFO of publicly traded companies to certify that they

are responsible for establishing and maintaining, and have established and maintained, adequate

disclosure controls and procedures, and internal control over financial reporting.  Defendants' false

certification that Just Energy's internal controls over financial reporting were effective when they

were in fact not represents a serious breach in their obligations to shareholders.

**Additional Allegations Supporting Scienter**

71.     McCollough's scienter can be inferred from the fact that he made statements

indicating that he was personally involved in monitoring issues related to customer credit

riskDuring the February 7, 2019 conference call with analysts McCollough described in detail Just

Energy's handling of customer credit risk in Texas, showing a detailed familiarity with, and

involvement in, the matter:

So in markets like Texas, just to give you an example, we have a requirement to
sell to any customer depending on -- independent of what their credit rating is.

However, we have the opportunity for lower credit scores to hold them accountable for a prepaid product or a deposit to protect ourselves. And we've actually raised the credit threshold where we do that. So we are attempting to call some of the higher credit risk customers.

72. McCollough also stated, during a May 22 conference call, that

We're working with a company called WNS on credit and collections in both North America and the U.K., and we're seeing significant collections improvements. In fact, they've been helping us recover bad debt that have previously been fully reserved. So we do see opportunity in bad debt as we go forward. And we're assuming minimal improvement in the guidance that we gave you.

73. McCollough's scienter can also be inferred from his abrupt resignation on August 5, 2019, shortly after the fraud was disclosed.

74. McCollough's scienter can further be inferred from the fact that the independent directors conducting the Strategic Review were able to rapidly uncover the fraud. The Strategic Review was announced on June 6, and according to the Amended 40-F, the company discovered and began remediating the situation before the end of the month of June, less than four weeks after the strategic review began.

75. McCollough's scienter is also evident as a result of the magnitude of the fraud. As set forth below, the adjustment that Just Energy disclosed in the provision for doubtful accounts was greater than the originally disclosed figure itself.

| Quarter Ending | Original | Revised | Adjustment | Percentage understatement |
|---|---|---|---|---|
| December 31, 2018 | $65.389[3] | $139.999 | $74.610 | 214.10% |
| March 31, 2019 | $81.037 | $192.202 | $111.165 | 237.18% |

76. This massive understatement concealed a huge increase in Just Energy's bad debt in the year 2019, according to the Amended 40-F, which showed that bad debt almost quadrupled

---

[3] in dollars in millions.

year over year.

> Bad debt expense was $192.2 million for the year ended March 31, 2019, an **increase of $135.9 million** from $56.3 million recorded for the prior year driven by higher revenue as well as the Texas residential enrolment and collections impairment and the U.K. receivables impairment. For the year ended March 31, 2019, the bad debt expense represents approximately 2.3% of revenue in the jurisdictions where the Company bears the credit risk, up from 1.9% of revenue reported for the year ended March 31, 2018, when excluding the non-recurring events. Management's target range is 2% to 3%.

77.     McCullough's scienter can further be inferred from the fact that the Amended 40-F itself acknowledges that McCollough had all of the information regarding the bad debt available to him but he simply failed to analyzse it. The Amended 40-F specifically stated that the "material weakness arose due to insufficient analysis of a rapid deterioration of the aging of the Company's accounts receivable caused by operational enrollment deficiencies in the Texas market, and due to operational and accounts receivable non-collection issues in the U.K. market."  The 40-F also made clear that the company unearthed the fraud not through some extraordinary effort but instead "identified these issues through operating controls related to the expected credit loss calculation." In short, the fraud was easily discoverable in the ordinary course.

78.     McCollough's motive can also be inferred from the fact that he was hired with a specific mandate to increase sales, and it is this attempt to increase sales that led to the massive increase in bad debt.

79.     Brown's scienter can be inferred from his statements at conference calls attesting to personal knowledge of the efforts Just Energy was undertaking to track credit scores and bad debts. For instance, Brown stated on a conference call dated May 16, 2019 that the Company was using analytics to improve the monitoring of credit scores and reduce bad debts. Brown also confirmed during the February 7, 2019 conference call that the company is focusing on bad debts.

80.     Brown's scienter can further be inferred from the fact that the independent directors

conducting the Strategic Review were able to rapidly uncover the fraud.  The Strategic Review was announced on June 6, and according to the Amended 40-F, the company discovered and began remediating the situation before the end of the month of June, less than four weeks after the strategic review began.

81.    Brown's scienter is also evident as a result of the magnitude of the fraud. As set forth below, the adjustment that Just Energy disclosed in the provision for doubtful accounts was greater than the originally disclosed figure itself.

| Quarter Ending | Original | Revised | Adjustment | Percentage difference |
|---|---|---|---|---|
| December 31, 2018 | $65.389 | $139.999 | $74.610 | 214.10% |
| March 31, 2019 | $81.037 | $192.202 | $111.165 | 237.18% |

82.    This massive understatement concealed a massive increase in Just Energy's bad debt in the year 2019, according to the Amended 40-F, which showed that bad debt increased almost 350% year over year.

> Bad debt expense was $192.2 million for the year ended March 31, 2019, an increase of $135.9 million from $56.3 million recorded for the prior year driven by higher revenue as well as the Texas residential enrolment and collections impairment and the U.K. receivables impairment. For the year ended March 31, 2019, the bad debt expense represents approximately 2.3% of revenue in the jurisdictions where the Company bears the credit risk, up from 1.9% of revenue reported for the year ended March 31, 2018, when excluding the non-recurring events. Management's target range is 2% to 3%.

83.    Brown's scienter can further be inferred from the fact that the Amended 40-F itself acknowledges that Brown had all of the information regarding the bad debt available to him but he simply failed to analyze it. The Amended 40-F specifically stated that the "material weakness arose due to insufficient analysis of a rapid deterioration of the aging of the Company's accounts receivable caused by operational enrollment deficiencies in the Texas market, and due to operational and accounts receivable non-collection issues in the U.K. market."  The 40-F also

made clear that the company unearthed the fraud not through some extraordinary effort but instead "identified these issues through operating controls related to the expected credit loss calculation."

## CLASS ACTION ALLEGATIONS

84.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired the publicly traded securities of Just Energy during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosure. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

85.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, the Company's securities were actively traded on NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by the Company or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

86.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

87.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class. Common questions of law and

fact exist as to

(a)     whether Defendants' acts as alleged violated the federal securities laws;

(b)     whether Defendants' statements to the investing public during the Class Period misrepresented material facts about the financial condition, business, operations, and management of the Company;

(c)     whether Defendants' statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)     whether the Individual Defendants caused the Company to issue false and misleading SEC filings and public statements during the Class Period;

(e)     whether Defendants acted knowingly or recklessly in issuing false and misleading SEC filings and public statements during the Class Period;

(f)     whether the prices of the Company's securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

(g)     whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

88.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

89.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

(a)    Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)    the omissions and misrepresentations were material;

(c)    the Company's securities are traded in efficient markets;

(d)    the Company's securities were liquid and traded with 3,450,786 shares per week on average during the Class Period;

(e)    the Company traded on the NYSE, and was covered by 13 analysts;

(f)    the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; Plaintiff and members of the Class purchased and/or sold the Company's securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts; and

(g)    unexpected material news about the Company was rapidly reflected in and incorporated into the Company's stock price during the Class Period.

90.    Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

91.    Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above

**FIRST CLAIM**
**Violation of Section 10(b) of The Exchange Act and Rule 10b-5**
**Promulgated Thereunder Against All Defendants**

92.    Plaintiff repeats and realleges each and every allegation contained above as if fully

set forth herein.

93.     This Count is asserted against the Company and the Individual Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

94.     During the Class Period, the Company and the Individual Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

95.     The Company and the Individual Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they: employed devices, schemes and artifices to defraud; made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of the Company's securities during the Class Period.

96.     The Company and the Individual Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These defendants by virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of the Company's allegedly

materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

97.     Individual Defendants, who are the senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other personnel of the Company to members of the investing public, including Plaintiff and the Class.

98.     As a result of the foregoing, the market price of the Company's securities was artificially inflated during the Class Period. In ignorance of the falsity of the Company's and the Individual Defendants' statements, Plaintiff and the other members of the Class relied on the statements described above and/or the integrity of the market price of the Company's securities during the Class Period in purchasing the Company's securities at prices that were artificially inflated as a result of the Company's and the Individual Defendants' false and misleading statements.

99.     Had Plaintiff and the other members of the Class been aware that the market price of the Company's securities had been artificially and falsely inflated by the Company's and the Individual Defendants' misleading statements and by the material adverse information which the Company's and the Individual Defendants did not disclose, they would not have purchased the Company's securities at the artificially inflated prices that they did, or at all.

100.     As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

101.    By reason of the foregoing, the Company and the Individual Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the Plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchases of the Company's securities during the Class Period.

**SECOND CLAIM**
**Violation of Section 20(a) of The Exchange Act**
**Against the Individual Defendants**

102.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

103.    During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information regarding the Company's business practices.

104.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Company's financial condition and results of operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

105.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which the Company disseminated in the marketplace during the Class Period. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which

artificially inflated the market price of the Company's securities.

106.    Each of the Individual Defendants, therefore, acted as a controlling person of the Company. By reason of their senior management positions and/or being directors of the Company, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, the Company to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of the Company and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

107.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.    Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.    Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.    Awarding such other and further relief as this Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: July 27, 2020                Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**

<u>/s/ Jonathan Stern</u>
Jonathan Stern (*pro hac vice*)
Phillip Kim, Esq. (*pro hac vice*)
275 Madison Avenue, 34th Floor
New York, NY 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: pkim@rosenlegal.com
        lrosen@rosenlegal.com

*Counsel for Plaintiff*

-and-

**STECKLER GRESHAM COCHRAN PLLC**
R. Dean Gresham
Texas Bar No. 24027215
12720 Hillcrest Rd, Suite 1045
Dallas, Texas 75230
Telephone: (972) 387-4040
Facsimile: (972) 387-4041
Email: dean@stecklerlaw.com