**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**

| | |
|---|---|
| THADDEUS WHITE, Individually and on Behalf of All Others Similarly Situated, | § **MEMORANDUM OF LAW IN** § **OPPOSITION TO MOTION TO DISMISS** § |
| Plaintiff, | § CIVIL ACTION NO. H-20-590 § |
| v. | § Hon. Lynn N. Hughes § |
| JUST ENERGY GROUP INC., PATRICK MCCULLOUGH, and JIM BROWN, | § JURY TRIAL DEMANDED § |
| Defendants. | § § § § § § |

**TABLE OF CONTENTS**

## Table of Contents

I.    Introduction .................................................................................................... 1

II.    Factual Background ........................................................................................ 2

III.    Argument .................................................................................................... 14

A.    Defendants do not Contest, and Therefore Concede, that their Statements are Materially Misleading.................................................................................................... 14

B.    The Complaint Plausibly Alleges Scienter.................................................. 14

1.    The Complaint Alleges Facts Showing that Defendants Knew or were Reckless for Not Knowing that their Statements Regarding the Allowance for Doubtful Accounts Were False  14

2.    The Scope and Obviousness of the Restatement Supports Scienter........................... 16

3.    The Complaint's Additional Allegations Support Scienter ...................................... 18

4.    Defendants Do Not Identify any Inference More Compelling than Scienter ............. 21

5.    Defendants do not Contest, and Therefore Concede, that the Complaint Alleges Scienter as to Defendants' Failure to Identify Material Weaknesses in Internal Controls and as to their Conference Call Statements ................................................................. 23

C.    The Complaint Establishes Scienter Against the Individual Defendants Specifically... 24

D.    The Complaint Alleges Control Person Liability........................................... 25

IV.    Conclusion .................................................................................................... 25

## TABLE OF AUTHORITIES

**Cases**

*Alaska Elec. Pension Fund v. Asar*, 898 F.3d 648 (5th Cir. 2018)......................................... 18, 19

*Fecht v. Price Co.*, 70 F.3d 1078 (9th Cir. 1995) ........................................................... 18

*Ho v. Flotek Indus., Inc.*, 248 F. Supp. 3d 847  (S.D. Tex. 2017) .................................. 21

*In re BP p.l.c. Sec. Litig.*, 843 F. Supp. 2d 712 (S.D. Tex. 2012).................................. 19

*In re Interpool, Inc. Sec. Litig.*, CA No. 04–321, 2005 WL 2000237, 2005 U.S. Dist. LEXIS 18112 (D.N.J. Aug. 17, 2005).................................................................. 16

*In re Sec. Litig. BMC Software, Inc.*, 183 F. Supp. 2d 860 (S.D. Tex. 2001)................................ 18

*In re Seitel, Inc. Sec. Litig.*, 447 F. Supp. 2d 693 (S.D. Tex. 2006) ............................. 16

*Newby v. Lay (In re Enron Corp. Secs.)* 258 F.Supp.2d 576 (S.D.Tex.2003).............................. 16

*Plotkin v. IP Axess Inc.*, 407 F.3d 690 (5th Cir. 2005) ................................................... 20

*Shaw v. Digital Equip. Corp.*, 82 F.3d 1194 (1st Cir. 1996) ........................................ 18

I.    **<u>Introduction</u>**

Patrick McCollough and James Brown became, respectively, the CEO and CFO of Just Energy in April of 2018 with a mandate to increase sales to new customers.  At the same time, they pledged to pay close attention to their collections and customer credit evaluations practices, to ensure that these new customers would translate into real revenues, not merely uncollectable accounts receivable. Yet, despite these promises, the company's processes for protecting against accumulating uncollectible accounts receivable rapidly broke down. Investors should have quickly learned of this breakdown because Just Energy should have reported in its financial statements its rapidly increasing amount of bad debt, specifically in its allowance for doubtful accounts.  Yet despite this massive accumulation of bad debt, Defendants McCollouch and Brown repeatedly caused Just Energy to issue financial statements that did not reflect its deteriorating financial condition, but instead showed results in line with what the company had reported in prior quarters. Defendants' fraud was cut short, however, when Just Energy's independent directors undertook a strategic review of the company and quickly uncovered the truth.  Just Energy, now under new management, has restated its allowance for doubtful accounts, admitting that the true figure was triple what they had previously reported.  This restatement also almost doubled Just Energy's loss for the year.

Defendants do not contest that they misstated Just Energy's allowance for doubtful accounts, or that the misstatement caused shareholder losses. Rather, they claim only that Plaintiffs have not alleged a strong inference of scienter.  To do this, though, the Motion to Dismiss concocts a fictional story about Defendants' misstatements that contradicts Just Energy's own admissions. The Motion to Dismiss falsely claims that Just Energy misstated its allowance for doubtful accounts because it mishandled the transition to a new accounting standard, IFRS 9. The problem

1

with this explanation, however, is that Just Energy, when issuing its financial statements, provided a specific numerical figure to identify the change in bad debt expense attributable to the switch to IFRS 9. When defendants restated their earnings and admitted to large misstatements, they left the figure related to the IFRS 9 switch unchanged, affirming that they had correctly accounted for the new standard. Rather, Just Energy admitted, in its Restatement, that its earlier misstatement was due to the aforementioned breakdown in company operations related to enrollment and debt collection. Defendants do not even attempt to provide an innocent explanation for why Just Energy did not honestly report financial figures that reflected that breakdown, confirming that there is no innocent explanation, that Defendants acted with scienter, and that the motion to dismiss should be denied.

## II.    **Factual Background**

Just Energy is an electricity utility that primarily sells natural gas powered electricity to customers. ¶27.[1] Through various subsidiaries, Just Energy carries on business in the United States, Canada and Europe. *Id.*

Just Energy is a utility company that bills residential customers for electricity on a monthly basis. Just Energy therefore at any given time carries an accounts receivable balance that in large part consists of money owed to it by customers. ¶28. As Just Energy explains in its form 40F for the year 2018, to take into account the fact that some customer account balances will actually be uncollectable, Just Energy records an allowance for uncollectable accounts that reflects an estimate of losses on account receivable balances. *Id.* Just Energy claimed that it determines the allowance for doubtful accounts on customer receivables by applying loss rates based on historical results to the outstanding receivable balance. *Id.*

---

[1] Unless otherwise specified, all references to ¶_ refer to paragraphs in the Amended Complaint.

In April of 2018 McCollough was promoted to the position of CEO. As Executive Chair Rebecca Macdonald explained at the June 27, 2018 shareholder meeting, McCollough was brought on to increase sales. ¶29. McCollough confirmed at the same meeting that if they did not achieve increased sales in his first year, he would consider it a failure. *Id.* Just Energy claimed that, as they ramped up sales, they were closely monitoring the risk of taking on bad debt as they aggressively expanded their customer base, particularly in Texas. ¶30. According to Brown, during a conference call dated February 7, 2019, Just Energy was extremely focused on bad debts, particularly in Texas. *Id.* McCollough, on that same call, noted that Just Energy was exposed to credit risk in Texas, but claimed that they were taking steps to protect themselves from riskier customers. *Id.* "So in markets like Texas, just to give you an example, we have a requirement to sell to any customer depending on -- independent of what their credit rating is. However, we have the opportunity for lower credit scores to hold them accountable for a prepaid product or a deposit to protect ourselves. And we've actually raised the credit threshold where we do that. So we are attempting to call some of the higher credit risk customers." *Id.*

On May 16, 2019, Defendants again reassured investors that the risk of bad debt was under control. ¶31. Responding to a question regarding a quarterly decline in the bad debt expense, Brown stated "we've taken a lot of efforts around customer analytics. We brought in a team of folks in BI to focus on the drivers of bad debt. I think we're starting to see some of the benefits of that. We've also taken actions to align credit scores in the proper channels to be of optimal value. So I think we'll continue to monitor as we go. But I think we could continue to see the bad debt improve." *Id.*

However, rather than closely track credit risk among new customers as promised, Just Energy's growth strategy instead led to a breakdown in operational controls to screen out high risk

3

clients. ¶32. As Scott Gahn, the now-CEO of Just Energy explained in a conference call on November 7, 2019, by mid 2018 Just Energy's internal controls to screen out high risk customers broke down, and Just Energy began enrolling a inordinately large number of high risk customers that violated internal controls, and then failed to reflect that fact in its financial statements reporting on bad debt and doubtful accounts. *Id.*

On June 6, 2019, Just Energy announced the commencement of a Strategic Review of the company by independent directors. ¶47.

> TORONTO, June 06, 2019 (GLOBE NEWSWIRE) -- Just Energy Group Inc. ("Just Energy" or the "Company") today announced that its Board of Directors has decided to undertake a formal review process to evaluate strategic alternatives available to the Company (the "Strategic Review"). This decision follows expressions of interest from a number of parties concerning potential transactions involving the Company.
>
> The Board of Directors has appointed its Strategic Initiatives Committee, comprised of all of the independent directors, to oversee the Strategic Review, with the assistance of Guggenheim Partners, LLC and National Bank Financial Inc., who have been retained as co-financial advisors.  Rebecca MacDonald, Executive Chair of the Company said, "The Board's goal is to unlock shareholder value with a view to the best interests of Just Energy and all its stakeholders."

> *Id.*

On July 23, 2019, before the market opened, Just Energy disclosed that it had "identified customer enrolment and non-payment issues, primarily in Texas, over the past 12 months" and that, as a result, it expected an impairment charge of CAD $45 to $50 million to its Texas residential accounts receivable. ¶48. The press release stated, in relevant part:

> Just Energy Group Inc. ("Just Energy") announced today that as part of the previously announced Strategic Review process, management identified customer enrolment and non-payment issues, primarily in Texas, over the past 12 months. As management identified these issues, more robust operational controls were put in place, culminating in numerous improvements being implemented during June and July 2019.

4

Due to the identified issues, management is updating its provisioning methodology used to estimate its reserve for trade receivables. Management expects an incremental impairment of the Texas residential accounts receivable of approximately CAD $45 to $50 million as of June 30, 2019.

"The enrolment and non-payment issues have been remediated and management is confident in the business and operational controls currently in place. These issues will not have a continuing effect on future cash flows," said Rebecca MacDonald, Just Energy's Executive Chair.

*Id.*

On this news, the Company's share price fell $0.66 per share, or over 15%, to close at $3.72 per share on July 23, 2019, on unusually heavy trading volume. ¶49. On August 5, 2019, the Company announced Defendant McCullough's departure as President, CEO, and director of Just Energy effective immediately. ¶50. On this news, Just Energy's share price fell $0.38 per share, or more than 10.7%, over the next two trading days to close at $3.16 per share on August 6, 2019, on unusually heavy trading volume. ¶51.

On August 14, 2019, after the market closed, Just Energy issued a press release entitled "Just Energy Reports Fiscal First Quarter 2020 Results." ¶52. The press release stated that the Company was suspending its dividend, that its adjustment to account receivables would be larger than expected, and that Just Energy would be restating several previously issued financial statements. *Id.* Further, the press release stated in relevant part:

During the quarter, management identified operational issues in customer enrolment and non-payment of accounts receivable in the Texas residential market, resulting in an aggregate adjustment of $58.6 million. Management also proceeded to identify collection issues in the U.K. market, resulting in an aggregate adjustment of $74.1 million. As a result, the Company recorded additional allowances for doubtful accounts which are included in the Company's restated third quarter and year-end financial statements for fiscal year 2019, and in the Company's first quarter results for fiscal year 2020, as referenced within each respective management discussion and analysis.

*Id.*

5

On this news, Just Energy's share price plummeted $1.39 per share, or over 44.8%, over the next two trading days to close at $1.71 per share on August 16, 2019, on unusually heavy trading volume. ¶53.

On August 15, on a call with investors, Scott Gahn, the new CEO of Just Energy, stated that:

> The second thing I'd like to talk about is the improvements in operational controls, recognition of impairments and the continued focus on financial discipline. Given my level of experience at Just Energy, I've been able to quickly involve myself in the operational issues underlying the Texas AR impairment that was announced last month, leading me to expand our review and drive the resolution of similar issues in our U.K. business, quantifying on additional impairment taken in that business. Both of these impairments have been recognized in their entirety, and strict remedial actions and policies were swiftly put in place to prevent such operational breakdowns from occurring again, restoring the operational and financial discipline and integrity that Just Energy, the Just Energy I know, is known for.
>
> Perhaps the most important thing I can say today regarding this matter is that these enrollment and nonpayment issues have been remediated. We have soberly assessed our opportunities for collection. We have made the difficult decisions, and we have booked the impairments. This means that they will not have a continued effect on future cash flows, and I, along with the entire management team and board, are confident in the business and operational controls in place going forward.

> ¶54

On August 19, 2019, Just Energy filed a Form 40-F/A with the SEC (the "2019 40-F/A") restating its financial results for fiscal year ending March 31, 2019. ¶55. The 2019 40-F/A disclosed that Just Energy's allowance for doubtful accounts for its fiscal year ended March 31, 2019 was understated by $111.2 million consisting of $53.7 million for doubtful accounts in its Texas residential market and $57.5 million related to operational and collection issues in its United Kingdom (U.K.) market. The 2019 40-F/A continued in relevant part:

> It was identified that during the quarters ended December 31, 2018, March 31, 2019 and June 30, 2019, management failed to effectively operate the control designed to capture appropriate expected credit loss rates to be reflected in the estimated

6

allowance for doubtful accounts in the Texas residential market and the U.K. market. This material weakness arose due to insufficient analysis of a rapid deterioration of the aging of the Company's accounts receivable caused by operational enrollment deficiencies in the Texas market, and due to operational and accounts receivable non-collection issues in the U.K. market. The CEO and the CFO concluded that as a result of the material weakness in internal control over financial reporting, the Registrant's design and operation of the Registrant's disclosure controls and procedures were not effective at March 31, 2019 to ensure that the information required to be disclosed in the reports that the Registrant files with or submits to the Commission is recorded, processed, summarized and reported, within the required time periods

*Id.*

The 40-F/A included the following note regarding the restatement:

Management identified operational issues in customer enrolment and non-payment in the Texas residential market. Management revisited the allowance for doubtful accounts as at March 31, 2019 and determined that additional reserves of $53.7 million were required at March 31, 2019. Management also identified collection issues in the United Kingdom ("U.K.") market and determined that additional reserves of $57.5 million were required at March 31, 2019. Management determined that the understatement was material, and as a result the financial statements for the year ended March 31, 2019 should be restated. Accordingly, in compliance with IAS 10, Events after the balance sheet date, the authorization date of these financial statements has been updated to August 14, 2019, and the financial statements reflect all subsequent events up to this date.

The following tables summarize the effects of the adjustment described above.

Line items on the restated consolidated statement of financial position and restated consolidated statement of changes in shareholders' equity

| | As at March 31, 2019 (As revised Note 5(b)) | Adjustment | As at March 31, 2019 (Restated) |
|---|---|---|---|
| Trade and other receivables | $ 783,780 | $ (111,165) | $ 672,615 |
| Current assets | $ 1,133,423 | $ (111,165) | $ 1,022,258 |
| Deferred income tax assets | 9,492 | (8,400) | 1,092 |
| Long term liabilities | 603,674 | (8,400) | 595,274 |
| Total Assets | $ 1,746,068 | $ (119,565) | $ 1,626,503 |
| | | | |
| Accumulated deficit | $ (1,271,136) | $ (119,565) | $ (1,390,701) |
| s' equity deficit | $ 30,550 | $ (119,565) | $ (89,015) |
| Total liabilities and shareholders' equity deficit | $ 1,746,068 | $ (119,565) | $ 1,626,503 |

Line items on the restated consolidated statements of income (loss)

7

| | As at March 31, 2019 (As revised Note 5(b)) | | Adjustment | | As at March 31, 2019 (Restated) | |
|---|---|---|---|---|---|---|
| Other operating expenses | $ | 115,016 | $ | 111,165 | $ | 226,181 |
| Total expenses | $ | 569,944 | $ | 111,165 | $ | 681,109 |
| Operating profit before: finance costs, change in fair value of derivative instruments and other income, net | $ | 142,271 | $ | (111,165) | $ | 31,106 |
| Profit (loss) before income taxes | $ | (97,662) | $ | (111,165) | $ | (208,827) |
| Provision for (recovery of) income taxes | | 2,829 | | 8,400 | | 11,229 |
| Profit (loss) from continuing operations | $ | (100,491) | $ | (119,565) | $ | (220,056) |
| Profit (loss) for the year | $ | (122,870) | $ | (119,565) | $ | (242,435) |
| Profit (loss) for the year attributable to: | | | | | | |
| Shareholders of Just Energy | $ | (122, 678) | $ | (119,565) | $ | (242,243) |
| Non-controlling interest | | (192) | | - | | (192) |
| Earnings (loss) per share from continuing operations | | | | | | |
| Basic | $ | (0.73) | $ | (0.80) | $ | (1.54) |
| Diluted | $ | (0.73) | $ | (0.80) | $ | (1.54) |
| Earnings (loss) per share available to shareholders | | | | | | |
| Basic | $ | (0.88) | $ | (0.80) | $ | (1.68) |
| Diluted | $ | (0.88) | $ | (0.80) | $ | (1.68) |

Line items on restated consolidated statements of comprehensive income (loss)

| | As at March 31, 2019 (As revised Note 5(b)) | | Adjustment | | As at March 31, 2019 (Restated) | |
|---|---|---|---|---|---|---|
| Profit (loss) for the year | $ | (122,870) | $ | (119,565) | $ | (242,435) |
| Total comprehensive income (loss) for the year, net of tax | $ | (117,848) | $ | (119,565) | $ | (237,413) |
| ive income (loss) attributable to: | | | | | | |
| Shareholders of Just Energy | $ | (117,656) | $ | (119,565) | $ | (237,221) |

Line items on restated consolidated statement of cash flows

| | As at March 31, 2019 (As revised Note 5(b)) | | Adjustment | | As at March 31, 2019 (Restated) | |
|---|---|---|---|---|---|---|
| Profit (loss) from continuing operations before income taxes | $ | (97,662) | $ | (111,165) | $ | (208,827) |
| Profit (loss) before income taxes | $ | (120,037) | $ | (111,165) | $ | (231,202) |
| rking capital balances | $ | (124,138) | $ | 111,165 | $ | (12,973) |

¶56.

As the above chart shows, the adjustments to allowance for bad debt, bad debt expense, accounts receivable and profit are extremely large, material adjustments. ¶57. Just Energy understated its balance for doubtful accounts by 237.18% and understated net loss by 93%. *Id*. Just Energy also stated in that same 40-F/A that they began remediating this material weakness

8

through operational and financial reporting control changes throughout the organization during the quarter ending June 30, 2019. ¶58. On this news, share price fell $0.15 per share, or over 8.77%, to close at $1.56 per share on August 19, 2019, further damaging investors. ¶59. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages. ¶60.

Restatements are required for "material" accounting errors that existed at the time financial statements were prepared. ¶61. By issuing the Restatement, Just Energy acknowledged that its financial statements for the restated periods were materially inaccurate, and did not comply with GAAP and were therefore false and misleading *when issued*. *Id.* GAAP also makes a distinction between a change in an estimate and the correction of historic facts. ¶62. If an estimate is changed, then no restatement is necessary. *Id.* However, if facts in existence at the time were not properly recorded or considered, then the original statement must be corrected. Corrections are to be adjusted by recording adjustments to current and previously issued financial statements. *Id.* Thus, by restating, Just Energy admitted that these were not judgmental mistakes in estimation, but that it had ignored or misused known facts that existed at the time the financial statements were prepared, evidencing knowing or reckless misconduct. *Id.*

In making its assessment of internal control over financial reporting, Just Energy's management used the criteria established by the Committee of Sponsoring Organizations of the Treadway Commission Report, *Internal Control – Integrated Framework* (1992) ("COSO Report"). ¶63.

The COSO Report, borrowing from generally accepted auditing standards, defines fair presentation in financial statements as containing the following:

9

- the accounting principles selected and applied have general acceptance;

- the accounting principles are appropriate in the circumstances;

- the financial statements are informative of matters that may affect their use, understanding and interpretation; and

- the financial statements reflect the underlying transactions and events in a manner that presents the financial position, results of operations and cash flows stated within a range of acceptable limits, that is, limits that are reasonable and practical to attain in financial statements.

¶64.

COSO makes clear that Management is responsible for complying with GAAP. ¶65. In the Restatement, Just Energy also admitted that it failed to live up to the COSO standards and that its prior statements (as reflected in the SOX certifications) regarding the effectiveness of its internal controls were in fact false when made:

**Restatement of previously issued Consolidated Financial Statements for the correction of an understatement of the allowance for doubtful accounts**

Subsequent to the issuance of the financial statements for the year ended March 31, 2019, management determined that the allowance for doubtful accounts was understated by $111.2 million.

Management identified operational issues in customer enrolment and non-payment in the Texas residential market ("the Texas residential enrolment and collections impairment"). Management has revisited the allowance for doubtful accounts and determined that additional reserves of $53.7 million were required at March 31, 2019. Management also identified operational and collection issues in the United Kingdom ("U.K.") market ("the U.K. receivables impairment") and determined that additional reserves of $57.5 million were required at March 31, 2019. Refer to Note 5 of the Restated Consolidated Financial Statements at March 31, 2019 for the effects of the adjustment described above.

Consequently, the Company's management has concluded that a material weakness in its internal controls over financial reporting existed during the year ended March 31, 2019.

A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a

10

material misstatement of the Company's annual or interim financial statements will not be prevented or detected on a timely basis.

The material weakness was caused by a failure to effectively operate a control to capture appropriate expected credit losses to be reflected in the estimated allowance for doubtful accounts. This issue occurred in the Texas residential market as a result of a rapid deterioration of the Company's accounts receivable aging caused by operational enrolment deficiencies, and in the U.K. market as a result of operational and customer non-payment issues, as further described in "Internal Control over Financial Reporting".

*Id.*

In other words, Just Energy, despite earlier stating that their internal controls were effective, belatedly admitted that they were not effective, because it understated the allowance for doubtful accounts by $111.2 million, due primarily to the fact that the Company failed to take into account the impact that its' enrollment of high risk customers in the US, and its failure to collect on debt in the UK would have on bad debt. ¶65

The Amended 40-F went on to state that:

**INTERNAL CONTROL OVER FINANCIAL REPORTING**

Both the CEO and CFO have designed, or caused to be designed under their supervision, the Company's Internal Control over Financial Reporting ("ICFR") which has been affected by the Board of Directors, management, and other personnel, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements in accordance with IFRS. Based on that evaluation the CEO and CFO concluded that because of the material weakness described below, the Company's disclosure controls and procedures were not effective.

*Identification of material weakness*

During the quarters ended December 31, 2018, March 31, 2019, and June 30, 2019, Management failed to effectively operate the control designed to capture appropriate expected credit loss rates to be reflected in the estimated allowance for doubtful accounts in the Texas residential market and the U.K. market. This material weakness arose due to insufficient analysis of a rapid deterioration of the

11

aging of the Company's accounts receivable caused by operational enrolment deficiencies in the Texas market, and due to operational and accounts receivable non-collection issues in the U.K. market.

On July 23, 2019, the Company announced operational measures implemented in the Texas residential market to address identified customer enrolment issues arising during prior periods that lead to additional overdue accounts being identified during the quarter ended June 30, 2019 that were impaired. Management identified these issues through operating controls related to the expected credit loss calculation.

Management identified an impairment of certain accounts receivable within the Texas residential markets of $58.6 million at June 30, 2019, of which $34.5 million relates to the quarter ended December 31, 2018, $19.2 million relates to the quarter ended March 31, 2019, and $4.9 million relates to the quarter ended June 30, 2019.

During the operation of the same control that identified the Texas enrolment and collections impairment at June 30, 2019, the Company determined the allowance for doubtful accounts related to the U.K. receivables required an adjustment of $74.1 million at June 30, 2019 of which $40.1 million relates to the quarter ended December 31, 2018, $17.4 million relates to the quarter ended March 31, 2019 and $16.6 million relates to the quarter ended June 30, 2019.

A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the company's annual or interim financial statements will not be prevented or detected on a timely basis. Due to the aforementioned adjustments, management identified a material weakness after issuing the financial statements for the year ended March 31, 2019.

*Remediation of material weakness in internal control over financial reporting*

Management is committed to the planning and implementation of remediation efforts to address the material weakness, as well as to foster continuous improvement in the Company's internal controls. These remediation efforts are underway and are intended to address the identified material weakness and enhance the overall financial control environment

During the quarter ended June 30, 2019, the Company made operational and financial reporting control changes throughout the organization and engaged third parties to advise the Company regarding this material weakness.

12

Management enhanced its methodology that quantifies and contemplates the aging profile of receivables, and recent collection history, in a more disaggregated manner than the model utilized at December 31, 2018 and at March 31, 2019, as described within Note 5 of the Company's restated consolidated financial statements for the year-ended March 31, 2019.

To further remediate the material weakness identified herein, the management team, including the CEO and CFO, have reaffirmed and reemphasized the importance of internal control, control consciousness and a strong control environment. The remediation of the material weakness is ongoing as not enough time has elapsed in order to conclude that it is operating effectively.

No assurance can be provided at this time that the actions and remediation efforts the Company has taken or will implement will effectively remediate the material weaknesses described above or prevent the incidence of other significant deficiencies or material weaknesses in the Company's internal controls over financial reporting in the future. The design of any system of controls is based in part upon certain assumptions about the likelihood of future events, and there can be no assurance that any design will succeed in achieving our stated goals under all potential future conditions.

¶68.

As the foregoing passage makes clear, although the company developed enhanced methodologies for analyzing bad debt, it nonetheless was able to detect the material weakness in internal controls over financial reporting by using its old methodology. ¶69. Therefore, the reason the Company did not disclose the material weakness earlier was not because the Company's methodology could not detect the weakness, but because the it did not implement that methodology in a timely fashion. *Id.*

The Sarbanes Oxley Act was passed in response to a series of dramatic corporate frauds, most notably the implosion of the Enron Corporation. ¶70, Among other protections, the Sarbanes Oxley Act requires the CEO and CFO of publicly traded companies to certify that they are responsible for establishing and maintaining, and have established and maintained, adequate

13

disclosure controls and procedures, and internal control over financial reporting. *Id.* Defendants' false certification that Just Energy's internal controls over financial reporting were effective when they were in fact not represents a serious breach in their obligations to shareholders. *Id.*

**III.    Argument**

### A.    Defendants do not Contest, and Therefore Concede, that their Statements are Materially Misleading

Defendants' motion to dismiss does not contest, and therefore concedes, that the Complaint plausibly alleges that Defendants' financial statements were materially misleading. Specifically, the Complaint alleges that Defendants understated their allowance for doubtful accounts and misleadingly failed to disclose that Just Energy did not operate its internal controls in an effective manner. ¶¶33-46.

### B.    The Complaint Plausibly Alleges Scienter

#### 1.    The Complaint Alleges Facts Showing that Defendants Knew or were Reckless for Not Knowing that their Statements Regarding the Allowance for Doubtful Accounts Were False

Defendants argue that, because accounting estimates such as the allowance for doubtful accounts are inherently subjective, Plaintiffs may only prove scienter by establishing that the statements were not honestly believed. However, the Fifth Circuit has already squarely rejected this argument, holding that "[r]equiring a plaintiff to allege that a defendant did not honestly believe a statement when made is inconsistent with the standard in this circuit, which permits scienter to be shown either by knowledge a defendant is publishing materially false information or by severe recklessness in publishing such information." *Owens v. Jastrow*, 789 F.3d 529, 543 (5th Cir. 2015). Because the Fifth Circuit has already addressed and rejected this "honest belief" standard, Defendants' citations to that standard carry no weight.

Defendants' claim that their misstatement was a result of a good faith error in adopting a

14

new accounting standard is also without merit.  Defendants claim that the failure to accurately report its Expected Credit Losses was due to difficulties in transitioning to the new IFRS 9 accounting standard.  But this is at odds with Defendants' own corrective disclosures, which both reaffirm that Defendants adoption of IFRS 9 had no connection to the reasons for the Restatement. ¶55. Just Energy admitted the misstatement resulted from Defendants' failure to properly operate already existing internal controls over financial reporting, and from major operational failures in customer enrollment and collections.  Defendants' 40F included a line item specifying the amount of its Expected Credit Losses attributable to the transition of IFRS 9. Cyrulnik Dec. Ex. 4, p. 29. When Defendants restated their financials, the IFRS adjustment remained unchanged. Ex. 5, p. 33. Just Energy's own restatements, therefore, stood by their application of IFRS 9. Defendants instead gave a different explanation for their misstatement:

> Management failed to effectively operate the control designed to capture appropriate expected credit loss rates to be reflected in the estimated allowance for doubtful accounts in the Texas residential market and the U.K. market. This material weakness arose due to insufficient analysis of a rapid deterioration of the aging of the Company's accounts receivable caused by operational enrolment deficiencies in the Texas market, and due to operational and accounts receivable non-collection issues in the U.K. market.
>
> ¶55

Defendants' own restatement specifies that they failed to operate existing controls that were in place to appropriately calculate expected credit loss rates. It further specifies that this was due to *insufficient* analysis of data that was in their possession at the time that Defendants issued their original financial statements. If this were really an innocent error as Defendants claim, it is peculiar that Scott Gahn, the new CEO of Just Energy, stated that he was determined to "restore" the integrity of Just Energy. ¶54. Stating that integrity must be restored is, if anything, an admission of prior culpability.

Defendants' claim that they restated financials merely as a result of reaching a different

15

judgment as to their expected future uncollectible accounts is implausible because it is at odds with the standards for issuing a restatement. "A restatement is proper if based on 'mathematical mistakes, mistakes in the application of accounting principles, or oversight or misuse of facts that existed at the time the financial statements were prepared.'" *In re Interpool, Inc. Sec. Litig.*, CA No. 04–321, 2005 WL 2000237, \*5, 2005 U.S. Dist. LEXIS 18112, \*15 (D.N.J. Aug. 17, 2005). Restatements are not required nor permitted when a company merely changes an estimate. Defendants also note that Ernst & Young approved Just Energy's original financial statements, while omitting the fact that E&Y subsequently withdrew that opinion when they learned the truth. Cyrulnik Dec., Ex. 6, p. 4.

### 2.    The Scope and Obviousness of the Restatement Supports Scienter

The particular circumstances of the restatement at issue here provide support for a strong inference of scienter. "While a financial restatement by itself is not sufficient to raise a strong inference of scienter, together with other allegations that take into account and measure the relative seriousness of the restatement, 'significant overstatements of revenue tend to support the conclusion that the defendants acted with scienter.'" *In re Seitel, Inc. Sec. Litig.*, 447 F. Supp. 2d 693, 705 (S.D. Tex. 2006) (quoting *Newby v. Lay (In re Enron Corp. Secs.)* 258 F.Supp.2d 576, 626 n. 55 (S.D.Tex.2003)). The Complaint establishes that both the sheer size of the restatement and the circumstances of the restatement create a strong inference of scienter.

As the Complaint explains, the magnitude of the fraud supports scienter. The misstatement more than doubled the allowance for doubtful accounts in the two restated quarters.

| Quarter Ending | Original | Revised | Adjustment | Percentage understatement |
|---|---|---|---|---|
| December 31, 2018 | $65.389[2] | $139.999 | $74.610 | 214.10% |
| March 31, 2019 | $81.037 | $192.202 | $111.165 | 237.18% |

---

[2] in dollars in millions.

16

¶75.

These losses were also massive when compared to the company's total earnings. Before the restatement, Just Energy reported a loss before taxes of $120,037,000. ¶56. The restatement increased the net loss to $231,202,000. *Id.* This amounts to a 93% increase as a result of the restatement.

Further supporting the inference of scienter is that the restatement concealed the fact that Just Energy's bad debt almost quadrupled year over year. The Company disclosed that "[b]ad debt expense was $192.2 million for the year ended March 31, 2019, an **increase of $135.9 million** from $56.3 million recorded for the prior year." ¶76. Defendants therefore did not merely make a large accounting misstatement, but a misstatement that reflected a massive and rapid underlying deterioration in their ability to collect accounts receivable. This means their customer base is much weaker than previously disclosed and it seriously damages the value of the Company.

Just Energy's restatement also makes clear that their misstatement concealed a collapse in the company's credit screening and collections operations. As the Amended 40-F stated, the rapid increase in doubtful accounts was the result of a failure to properly collect past due accounts and to screen out high risk customers. ¶68. Defendants not only failed to disclose this deterioration in the company's practices, but falsely claimed that they were improving their practices. McCulloch, on a May 22 conference call, claimed that the company was seeing significant *improvement* in collections, and were implementing new procedures to insulate themselves from high risk clients. ¶71.

Defendants also note that the mere size of the restatement does not on its own support a strong inference of scienter. But while the size of a restatement, standing alone, does not fully establish a strong inference of scienter, the large soze of a restatement does provide significant

17

support for an inference of scienter that can be bolstered by other factors. *Alaska Elec. Pension Fund v. Asar*, 898 F.3d 648, 656 (5th Cir. 2018), opinion withdrawn and superseded on reh'g in part on other grounds, 768 F. App'x 175 (5th Cir. 2019). Defendants do not challenge and therefore concede that the large size of the restatement contributes to a strong inference of scienter, even if standing alone it does not. And the totality of the circumstances, as set forth below, provide a strong inference of scienter.

### 3.    The Complaint's Additional Allegations Support Scienter

The fact that Defendants corrected their statements a mere two months after making them supports a strong inference of scienter. *In re Securities Litigation BMC Software, Inc.* collected cases finding that close temporal proximity between a misstatement and its correction, ranging from three weeks to seven months, provides strong circumstantial evidence of scienter. *In re Sec. Litig. BMC Software, Inc.*, 183 F. Supp. 2d 860, 911 (S.D. Tex. 2001); *see also Shaw v. Digital Equip. Corp.*, 82 F.3d 1194, 1225 (1st Cir. 1996); *Fecht v. Price Co.*, 70 F.3d 1078, 1083 (9th Cir. 1995). The fact that Defendants corrected their false statements within two months of the final misstatement supports scienter. Defendants argue that despite the large size of the restatement, the fact that Just Energy "promptly addressed the issue upon identifying it" rebuts any inference of scienter. But this ignores that the individuals who issued the misstatement were not the individuals who discovered and corrected it. The fact that the independent directors so quickly detected McCollough and Brown's misstatements enhances the inference of fraud. *In re Sec. Litig. BMC Software, Inc.*, 183 F. Supp. 2d at 911.

Further supporting a strong inference of scienter is the Defendants' signing of false Sarbanes Oxley certifications, coupled with their knowledge of red flags that revealed that their statements were false. The Fifth Circuit has "adopted the Eleventh Circuit's approach to SOX certifications: A Sarbanes–Oxley certification is only probative of scienter if there are facts

18

establishing that the officer who signed the certification had a reason to know, or should have suspected, due to the presence of glaring accounting irregularities or other red flags, that the financial statements contained material misstatements or omissions." *Alaska Elec. Pension Fund* 898 F.3d 648 at, opinion withdrawn and superseded on reh'g in part on other grounds, 768 F. App'x 175 (5th Cir. 2019) (internal quotations omitted). The rapid deterioration in company enrollment standards and in collections practices was itself a massive red flag that should have alerted Defendants to the fraud. McCollough also made clear he was closely monitoring customer enrollment and account collections,

McCollough's and Browns' statements that they were directly involved in the monitoring and tracking of customer credit risk, bad debt, and customer credit scores (¶¶71-72, 79) establish a strong inference of scienter because those statements made clear that McCollough and Brown had a duty to monitor the exact subject matter of the misstatements. They did not do so. In *In re BP.*, the District Court held that "[p]laintiffs adequately allege scienter with respect to [the CEO] by pointing to [the CEO's] own admissions as to what his job as CEO entailed, including verbal commitments revealing that he took responsibility for BP's process safety efforts and was the key individual tracking that progress." *In re BP p.l.c. Sec. Litig.*, 843 F. Supp. 2d 712, 782–83 (S.D. Tex. 2012). Similarly here, McCollough and Brown's verbal commitments to reduce bad debts create a strong inference that they were aware that the amount of bad debts were increasing, not decreasing.

Brown's conference call statement is especially indicative of scienter because it was in response to an analyst's question that covered the precise subject matter of the fraud. When an officer receives an analyst's specific question regarding the subject matter of a misstatement and the officer reaffirms that misstatement, it bolsters the inference of scienter. *Institutional Inv'rs Grp.*

19

*v. Avaya, Inc.*, 564 F.3d 242, 270 (3d Cir. 2009). During a conference call on May 16, 2019, an analyst asked Brown to discuss how Just Energy achieved a quarterly decline in bad debt expense. Brown answered that "we've taken a lot of efforts around customer analytics. We brought in a team of folks in BI to focus on the drivers of bad debt. I think we're starting to see some of the benefits of that. We've also taken actions to align credit scores in the proper channels to be of optimal value. So I think we'll continue to monitor as we go." ¶31. The reality, however, is that the apparent decline in bad debt was due entirely to the then as yet undisclosed misstatement. The fact that Brown would provide a fabricated explanation for a non-existent decline in bad debt further supports scienter.

Defendants mischaracterize these facts as "general knowledge about certain aspects of the company's business", ignoring the fact that the Complaint quotes Defendants McCollough and Brown as expressing specific detailed knowledge of the *precise* subject matter of the disclosure, particularly given, as McCollough and Brown made clear, the importance of these figures to Just Energy's business and the ultimate scope of the restatement. *Plotkin v. IP Axess Inc.*, 407 F.3d 690, 700 (5th Cir. 2005) (finding that a complaint alleged that defendants knew or were reckless for not knowing that deal partners were unable to make contracted payments, which led to a strong inference of scienter because of the crucial nature of those payments to the defendant company and defendants' public announcement that the deals would bring in multimillion dollar revenues). Here, similarly, Defendants made clear that the subject matter of their misrepresentations, credit risk, bad debt, and customer credit scores, was vitally important to the Company, and that they were paying close attention to those figures, and yet somehow drastically misstated them.

Defendants cite to cases that do not address the facts at hand. *Bulmahn* holds that a complaint did not allege individual defendants' scienter merely by alleging defendants' position

20

and general familiarity with the subject matter of the litigation. *Cornell Companies* involves a very different set of facts – the court found that an individual defendants' involvement in negotiating a off balance sheet accounting transactions did not establish scienter as to those transactions' ineligibility for off balance sheet accounting. *In re Cornell Companies, Inc. Sec. Litig.*, No. CV H-02-0866, 2005 WL 8165685, at *10 (S.D. Tex. Mar. 31, 2005).  *Flotek* simply held that just because a defendant invented a software product, that does not mean that he knew or was reckless for not knowing that the company fed fabricated data into the product. *Ho v. Flotek Indus., Inc.*, 248 F. Supp. 3d 847, 860 (S.D. Tex. 2017)

### 4.     Defendants Do Not Identify any Inference More Compelling than Scienter

Defendants claim that non-culpable inferences are more compelling than the inference of scienter in this case, but the sole non-culpable explanation that defendants provide – that defendants were confused about the application of IFRS 9, is at odds with Just Energy's own corrective disclosures after independent directors uncovered McCollough and Douglas's misstatements. Rather, the cause of the misstatement was a rapid underlying deterioration in the controls over Just Energy's business practices: the "material weakness arose due to insufficient analysis of a rapid deterioration of the aging of the Company's accounts receivable caused by operational enrolment deficiencies in the Texas market, and due to operational and accounts receivable non-collection issues in the U.K. market." ¶65 IFRS 9 played no role in the Restatement.

Defendants also claim that the misstated bad debt involve judgment and projection about future events.  But that also contradicts Just Energy's own corrective disclosures. Just Energy stated that to remediate its deficient internal controls, "[m]anagement enhanced its methodology that quantifies and contemplates the aging profile of receivables, and recent collection history, in a more disaggregated manner than the model utilized at December 31, 2018 and at March 31,

2019." ¶68.  That is, the source of the error was poor evaluation of the past, not an inability to predict the future.

Defendants come closer to acknowledging the actual source of the misstatement when they state that the restatement arose from two of the company's markets "that experienced atypical customer-collection issues (Texas residential and U.K.) that became apparent in connection with the company's analysis of additional data as part of its Strategic Review." MTD at 19. What Defendants ignore, however, is that the data was available to Defendants McCollough and Brown at the time of the misstatements, and that McCollough and Brown were expected to analyze that data in the course of operating internal controls over financial reporting. In restating, Just Energy conceded that "management **failed to effectively operate the control** designed to capture appropriate expected credit loss rates to be reflected in the estimated allowance for doubtful accounts in the Texas residential market and the U.K. market. This material weakness arose due **to insufficient analysis of a rapid deterioration of the aging of the Company's accounts receivable** caused by operational enrollment deficiencies in the Texas market, and due to operational and accounts receivable non-collection issues in the U.K. market." ¶55. "*Insufficient analysis*" means Defendants ignored the facts in their possession.  That is, there were controls in place which, if properly operated, would have led to Defendants properly reporting their allowance for doubtful accounts correctly in the first instance.  The failure to operate those controls was at best, reckless.

Scott Gahn's accounts of the remedial efforts that Just Energy undercuts the idea that the restatement was simply the result of a difference of opinion of how to apply a new accounting standard. Gahn stated that "strict remedial actions and policies were swiftly put in place to prevent such operational breakdowns from occurring again, restoring the operational and financial discipline and integrity that Just Energy, the Just Energy I know, is known for." ¶54. That Just

22

Energy's new CEO pledged to restore the company's integrity is strong confirmation that McCollough and Brown's actions were anything but innocent.

**5.      Defendants do not Contest, and Therefore Concede, that the Complaint Alleges Scienter as to Defendants' Failure to Identify Material Weaknesses in Internal Controls and as to their Conference Call Statements**

While Defendants present several arguments as to why the Complaint fails to plead scienter as to their understatement of doubtful accounts, Defendants do not contest that their failure to disclose material weaknesses in the operation of their internal controls was made with scienter. The Complaint alleges that the failure to disclose material weaknesses in their internal controls was misleading. ¶46. Because Defendants do not challenge allegations that these statements were made with scienter, the motion to dismiss should be denied.

The Motion to Dismiss also does not address McCollough and Brown's conference call statements that directly stated that Just Energy was improving its situation with regard to bad debt. Specifically, in response to a question about how Just Energy's reported bad debt declined quarter to quarter, Brown stated "I think we've -- as we've mentioned in prior quarters, we've taken a lot of efforts around customer analytics. We brought in a team of folks in BI to focus on the drivers of bad debt. I think we're starting to see some of the benefits of that. We've also taken actions to align credit scores in the proper channels to be of optimal value.." ¶42. Brown therefore not only issued false and misleading financial statements showing that Just Energy's bad debt was declining rather than increasing, he provided fictitious explanations for the non-existent decline. Brown did not merely make an accounting error, he concocted a false story about non-existent corporate achievements.

McCollough made similar false statements on the same conference call. "We're working with a company called WNS on credit and collections in both North America and the U.K., and we're seeing significant collections improvements. In fact, they've been helping us recover bad

23

debt that have previously been fully reserved. So we do see opportunity in bad debt as we go forward. And we're assuming minimal improvement in the guidance that we gave you." ¶43. That is, while Just Energy's collection practices were "rapidly deteriorating," ¶55, McCollough falsely assured investors that they were improving. Nothing in the Motion To Dismiss gives any innocent explanation for this drastic misrepresentation of the true state of affairs.

### C.    The Complaint Establishes Scienter Against the Individual Defendants Specifically

The Motion to Dismiss claims that there are no allegations specifically showing Brown or McCollough's scienter. Defendants summarize the specific allegations against Mccollough as only that he participated in investor conference calls, aimed to increase sales, and left the company. But this summary does not capture the full import of the allegations against McCollough. On the conference calls in question McCollough made clear that he was successfully implementing programs to assure that Just Energy was protected against high credit risk customers, ¶71, and implementing new collections programs in the US and the UK to improve collections practices. ¶72. In reality, and as Just Energy later admitted, the company's practices in both of these areas had rapidly deteriorated under McCollough's tenure. Given that the accounts receivable and enrollment controls were rapidly collapsing under McCollough's tenure, it is simply implausible that he could sincerely claim that these areas were improving.

The situation is similar with respect to Brown's statements. Brown claimed provided specific reasons to explain Just Energy's non-existent improvements in tracking bad debts and credit scores. ¶79.  Given that during this time customer credit scores were declining and bad debts were soaring, the only plausible explanations for Brown's statements were 1) that he was not actually monitoring these areas at all, rendering this statement knowingly misleading or 2) that he was monitoring those areas and deliberately excluded the bad numbers from company financial

24

statements.

**D.    The Complaint Alleges Control Person Liability**

Defendants do not contest and therefore concede that Defendants McCollouch and Brown were control persons of Just Energy. Therefore, the control person allegations should be sustained.

**IV.    <u>Conclusion</u>**

For the foregoing reasons the motion to dismiss should be denied. If granted, Plaintiffs request leave to replead.

25

Dated: January 12, 2021                    Respectfully submitted,

                                           **THE ROSEN LAW FIRM, P.A.**

                                           /s/ Jonathan Stern
                                           Jonathan Stern (*pro hac vice*)
                                           Phillip Kim, Esq. (*pro hac vice*)
                                           275 Madison Avenue, 40th Floor
                                           New York, NY 10016
                                           Telephone: (212) 686-1060
                                           Fax: (212) 202-3827
                                           Email: pkim@rosenlegal.com
                                                   lrosen@rosenlegal.com

                                           *Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on January 12, 2021, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to counsel of record.

/s/ *Jonathan Stern*
Jonathan Stern
